UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

GRISELDA NUNEZ o/b/o Y.C.,                    :

                    Plaintiff,           :   **MEMORANDUM**
                                                            **DECISION AND ORDER**

     -against-                                   :

                                                      07 Civ. 11075 (FM)

MICHAEL J. ASTRUE,                              :
Commissioner of Social Security,

                                     :

                  Defendant.
------------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.    Introduction

        Plaintiff Griselda Nunez ("Nunez") brings this action on behalf of her minor daughter, Y.C., pursuant to Section 405(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), to seek review of a final decision of the Commissioner of Social Security ("Commissioner") denying Y.C.'s application for Supplemental Security Income ("SSI") benefits.  The Commissioner now has moved to remand the case for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  Nunez has cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking to reverse the decision of the Administrative Law Judge ("ALJ") and remand the case solely for the calculation of benefits or, alternatively, for further administrative proceedings.

For the reasons that follow, the Commissioner's motion is granted, and Nunez's cross-motion is denied.

II.     Background

   A.     Procedural History

On July 31, 2006, Nunez filed an application for SSI benefits in which she alleged that her daughter became disabled on June 7, 2005. (R. 18, 34).[1] After the application was denied,[2] Nunez requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Mark Hecht on June 7, 2007. (Id. at 30, 179). On July 6, 2007, ALJ Hecht denied the application for SSI benefits. (Id. at 17). Nunez then sought review of the ALJ's decision, (id. 167-70), but the Appeals Counsel denied that request on November 9, 2007, (id. at 4A-8).

Nunez commenced this action on December 7, 2007. (See Docket No. 2 (Compl.)). She has been represented by counsel at the hearing, in connection with her request for review by the Appeals Council, and in this suit. (Id.; R. 167-70, 179). On November 21, 2008, the parties consented to my exercise of jurisdiction over this matter for all purposes pursuant to 28 U.S.C. § 636(c). (Docket No. 15). The Commissioner then moved to remand the case for further administrative proceedings pursuant to the

---

[1] "R." refers to the certified copy of the administrative record filed by the Commissioner as part of the Answer. (Docket No. 9).

[2] Neither the application nor the notice of disapproved claim is contained in the record.

2

fourth sentence of 42 U.S.C. § 405(g).  (Docket No. 11).  Thereafter, on October 15, 2008, Nunez cross-moved for judgment on the pleadings pursuant to Rule 12(c), seeking to reverse the ALJ decision and remand solely for the calculation of benefits, or, alternatively, for further administrative proceedings.  (Docket No. 12).  The Commissioner replied on October 23, 2008, arguing that the case is not ripe for calculation of benefits because the ALJ's decision was "based on an incomplete record and improper evaluation of the evidence."  (Docket No. 17 at 1).

  B. Relevant Facts

    1. Nunez's Testimony

Nunez testified at the hearing that her daughter was born on November 8, 1996, and that the two were involved in a car accident when Y.C. was four years old.  (R. 183).  Two to three years later, Y.C. began complaining of neck pain, without any other prior injury or disease.  (Id. at 184).  At first, Nunez did not take her daughter to the doctor because she thought she was merely tired and did not want to acknowledge that something might be wrong.  (Id. at 185-86).  When Nunez eventually brought Y.C. to the doctor two years later, she was told that the x-rays revealed a "bulging disc" and "[s]omething about cervical ribs."  (Id. at 186).  The doctor suggested physical therapy and prescribed Motrin, which often gave Y.C. headaches.  (Id. at 186-87).  Y.C. also treated the headaches, which usually lasted for half an hour, with Tylenol.  (Id. at 187).

Y.C. had physical therapy twice a week, but Nunez did not notice any improvement. (Id. at 188). No doctor ever suggested that Y.C. use a neck brace, but a surgery consultation, to which Nunez had yet to take Y.C., had been recommended. (Id. at 191-92).

Y.C. is unable to play or run with other children because her knees and neck begin to hurt. (Id. at 194-95). Nunez often ices her daughter's head because she gets headaches from the neck pain. Moreover, Y.C. has difficulty completing homework assignments and staying in class because she cannot sit for more than about one-half hour without discomfort. (Id. at 194-96). Y.C.'s school activities such as gym class have been restricted, and she was absent once or twice each week during the 2006-2007 school year because of neck and knee pain. (Id. at 189-90). Despite these absences, Nunez believed that her daughter's grades were "normal." (Id. at 191).

According to Nunez, Y.C. also expressed anxiety about riding in elevators ever since a blackout in New York City two years earlier. (Id. at 196-97). Although Y.C. and her mother live on the thirteenth floor of a building, Y.C. often is afraid to take the elevator downstairs in order to go to school. (Id. at 197).

2.   Y.C.'s Testimony

Y.C. testified that she has pain almost every day, is unable to attend gym class, and has difficulty sitting through her classes. (Id. at 210-11). Her back starts to hurt almost every day before lunch, at which point she asks her teacher for permission to

4

walk around to stretch it.  (Id. at 211-12).  Y.C. confirmed her mother's testimony that she was absent from school approximately twice each week because of her condition, but nevertheless has been able to manage her schoolwork.  (Id. at 212).  She stated that she is able to do her homework for about one-half hour before her neck begins to hurt, after which her mother puts her on the couch to rest.  (Id. at 212-13).  Y.C. also told her doctor that her neck would become hot and her head would start burning, with the pain and heat lasting all night.  (Id. at 214-15).

### 3. Medical Evidence

#### a. Initial Treatment and Physical Therapy

Nunez first sought treatment for Y.C.'s neck and back pain on June 7, 2005, at which point pediatrician Dr. Juan Tapia referred her for x-rays.  (Id. at 143).  In his June 10, 2005, diagnostic report, radiologist Dr. Mark D. Freilich noted that his impression was that Y.C. had (i) "straightened lordosis suggesting muscular spasm," (ii) "mild disc space narrowing at levels C4-C6," and (iii) "bilateral cervical ribs."  (Id.).  On June 15, 2005, based on the x-ray report and his findings of recurrent neck and back pain, Dr. Tapia referred Y.C. to Dr. Michael G. Vitale, (id. at 85), who stated in a progress report dated June 23, 2005, that Y.C.'s exam was "absolutely consistent with a muscular etiology of back pain," that the x-rays showed straightening of the lordosis in her cervical spine, and that he recommended physical therapy twice a week for twelve weeks.  (Id. at 72, 84).

From 2006 to 2007, Y.C. underwent physical therapy treatments. In February and June through September 2006, she saw physical therapist Larry Shapiro. (Id. at 80-83, 96, 102). In October and November 2006, Dr. Tapia referred Y.C. for further physical therapy with isometric strengthening for her cervical spine. (Id. at 132, 133). In January 2007, Dr. Pablo L. Pimentel also prescribed physical therapy twice a week. (Id. at 137). Y.C. was absent from school for physical therapy treatments on at least three occasions: January 11 and 15, and February 1, 2007. (Id. at 134, 140, 141).

      b.    Dr. Schwab

In addition to the physicians, therapists, and technicians noted above, Y.C. saw other specialists for diagnostic and treatment purposes. In February, August and September 2006, Y.C. saw Dr. Frank Schwab, a pediatric orthopedic surgeon at the Spine Center. (Id. at 114-16). On February 17, 2006, Dr. Schwab noted that Y.C. complained of neck and lower back discomfort, but that the pain was never severe or radiating, and that her x-rays were unremarkable. (Id. at 116). On August 9, 2006, Dr. Schwab noted that Y.C. had intermittent neck pain, but no lower back pain or neurological deficits to her extremities. (Id. at 115). Given the persistence of Y.C.'s symptoms, Dr. Schwab ordered an MRI of her cervical spine, (id.), which revealed straightening of the normal cervical lordosis and posterior bulges in the discs between C4-C5 and C5-C6. (Id. at 117-18). Following the MRI, Dr. Schwab reported that he did not consider the small disc bulges to be "evidence of significant herniation or any bone pathology;" nevertheless, in light of

Y.C.'s complaints of neck, shoulder, wrist, and knee pain, he recommended a "rheumatological evaluation" to rule out other sources of the pain (Id. at 114).

        c.      Dr. Lazar

On August 28, 2006, Y.C. was examined by Dr. Meredith A. Lazar, another orthopedist. (Id. at 110-13). Dr. Lazar noted in her report that Y.C.'s daily pain was localized in her cervical neck, that after the neck pain she "gets hot" and soon develops a headache, and that "she can't jump[]rope with friends." (Id. at 110). Dr. Lazar noted that the pain did not radiate down her arms or legs and improved with Tylenol. (Id.). She reviewed the 2005 x-rays and the 2006 MRI, noting mild tenderness to the cervical neck on palpitation ("ttp") as well as mild scoliosis. (Id.). She recommended further cervical spine scans, and noted that if they were negative, she would "likely obtain a child psychiatry consult for possible conversion disorder."[3] (Id.).

        d.      Dr. Shalhoub

On October 6, 2006, Y.C. was examined by Dr. Robert Shalhoub, a consulting physician for the Social Security Administration. (Id. at 125-26). All examination results were normal, except for Y.C.'s vision, which was 20/50 with glasses. (Id. at 125A). Dr. Shalhoub's impression was cervical pain and low back pain of

---

       [3]      A conversion disorder is a "mental disorder in which an unconscious emotional conflict is expressed as an alteration or loss of physical functioning, usually controlled by the voluntary nervous system." Stedman's Medical Dictionary (27th ed. 2000).

unknown etiology, secondary headaches, and the possibility of secondary gain.[4] (Id. at 126). He also noted that she exhibited no emotional problems in the exam room and that her initial nervousness "was secondary to riding the elevator." (Id.).

    e. Dr. Strongwater

On October 11, 2006, Y.C. was seen by Dr. Allan Strongwater, clinical professor of orthopedic surgery at the New York University Hospital for Joint Diseases. (Id. at 177). He reviewed Y.C.'s earlier x-rays and MRI, and two-year history of pain and discomfort, but "doubt[ed] that the few millimeters of translation of the ring of [the vertebrae] . . . is the etiology for her pain." (Id.). Dr. Strongwater did, however, believe that Y.C. needed a neurological consultation and blood tests to rule out rheumatic fever and rheumatoid arthritis. (Id. at 177-78). In December of that year, Y.C.'s pediatrician, Dr. Tapia, referred her for a neurological exam at the Harlem Health Center. (Id. at 139).

    f. Dr. Pimentel

On February 27, 2007, Y.C. was examined by Dr. Pablo L. Pimentel, a pediatric neurologist at the Harlem Health Center. (Id. at 149-50). Dr. Pimentel reviewed the earlier x-rays and MRI, observing "C4, C6 narrowing and C3, C4 posterior bulging and herniation of discs." (Id. at 149). Y.C.'s physical examination was normal. (Id.) He noted in his report that the flexor of Y.C.'s neck caused her mild cervical and shoulder

---

  [4] Secondary gain refers to "interpersonal or social advantages," such as attention and sympathy, "gained indirectly from organic illness." Stedman's Medical Dictionary (27th ed. 2000).

pain, that she evidenced some learning disability in spelling, reading, and math, and that she showed signs of cervical ribs thoracic outlet syndrome.[5] (Id. at 150). Y.C. complained that the pain in her legs, which Dr. Pimentel described as cervical cephaligia and myalgia of lower extremities, was exacerbated by prolonged walking. (Id.). Dr. Pimentel recommended further one-on-one tutoring, continued physical therapy, exercise restraint at school, Motrin or aspirin for pain, and a neuro-surgical consultation. (Id.).

On May 4, 2007, Dr. Pimentel completed a spinal disorder questionnaire regarding Y.C.'s treatment. (Id. at 151). He indicated that Y.C. suffered from a "herniated nucleus pulpous"[6] and degenerative disc disease which resulted "in the compromise of a nerve root . . . or the spinal canal . . . characterized by neuroanatomic distribution of pain, limitation of motion of the spine, [and] motor loss . . . accompanied by sensory or reflex loss." (Id.). Dr. Pimentel noted Y.C.'s treatment consisted of physical therapy and exercise restrictions at school. (Id. at 152).

---

[5]   Thoracic outlet syndrome is the "collective title for a number of conditions attributed to compromise of blood vessels or nerve fibers . . . at any point between the base of the neck" and the "space below the shoulder joint." Stedman's Medical Dictionary (27th ed. 2000).

[6]   A herniated nucleus pulposus (it appears the record has an incorrect spelling for the last word) "is a slipped disk along the spinal cord . . . [which] occurs when all or part of the soft center of a spinal disk is forced through a weakened part of the disk." U.S. National Library of Medicine, National Institutes of Health, Medline Plus Medical Encyclopedia, Herniated Nucleus Pulposus, http://www.nlm.nih.gov/MEDLINEPLUS/ency/article/000442.htm (last visited Mar. 25, 2009).

4.  Non-Medical Evidence

The administrative record also contains three of Y.C.'s report cards which show a progressive increase in her absences. During the 2004-2005 school year, Y.C was late fourteen days and absent nine days, and her grades were all in the A/B range. (Id. at 71A). During the 2005-2006 school year, Y.C. was late once and absent twenty-two times. (Id. at 66). Her academic scores ranged from the 70s to 80s and she was recommended for summer school in reading and language arts. (Id.). Finally, by the end of the 2006-2007 school year, Y.C. had accumulated twenty-two late days and sixty-six absences. (Id. at 171). Her grades also slipped to the 60s and 70s, and she was required to attend summer school in math as a prerequisite to promotion to the sixth grade. (Id.).

5.  ALJ's Findings

After hearing testimony from Nunez and Y.C. and reviewing the medical evidence, the ALJ found that Y.C. suffered from "cervical cephalgia[7] and myalgia of the lower extremities[,] degenerative bulging disc of the cervical spine and headaches," which had lasted for twelve continuous months. (Id. at 16). Nevertheless, the ALJ concluded that Y.C.'s impairments "result in less than marked limitation of general health and well being," (id.), and none "meets or medically equals the criteria of any impairment listed in [20 C.F.R. § 404, Appendix 1, Subpart P]." (Id. at 17).

---

[7]     Cephalgia appears to be an alternate spelling of Cephalalgia, which means "headache." Stedman's Medical Dictionary (27th ed. 2000).

In reaching this conclusion, the ALJ noted the findings of Y.C.'s treating physicians, Drs. Vitale, Schwab and Strongwater, as well as her consulting physicians, Drs. Shalhoub and Pimentel, (id. at 16), but he did not explain the weight given to any of their opinions. He also did not address the evidence of Y.C.'s increasingly common school absences and slipping grades.

III.   Discussion

The Commissioner seeks remand of this case on the ground that the ALJ based his decision on an incomplete record. (See Docket No. 14 ("Def.'s Mem.") at 6). The Commissioner further contends that the ALJ improperly failed to explain the weight he gave the treating source evidence. (Id. at 8). Finally, the Commissioner asserts that remand, rather than an award of benefits, is warranted because the record does not compel the conclusion that Y.C. is disabled. (Id. (citing Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998))).

   A.   Remand

The Act authorizes a reviewing court to reverse a Commissioner's decision and remand a case to the Commissioner for further administrative proceedings. 42 U.S.C. § 405(g). Sentence four of that provision provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the [case] for a rehearing.

Id.  Remand to the Commissioner is appropriate "when there are gaps in the administrative record or the ALJ has applied an improper legal standard."  Rivera v. Barnhart, 379 F. Supp. 2d 599, 603-04 (S.D.N.Y. 2005) (quoting Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999)).  Thus, if the reviewing district court finds that the ALJ's determination was not supported by substantial evidence, remand is proper.  Id. at 604 (citing Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004); Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).

      B.     <u>Legal Standard for Disability Claims of Children</u>

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The regulations require a three-step evaluation to determine whether a child is disabled.  20 C.F.R. § 416.924; see, e.g., Martinez v. Astrue, No. 07 Civ. 3156 (WHP) (GWG), 2008 WL 4178155, at *7 (S.D.N.Y. Sept. 8, 2008) (citing Pollard v. Halter, 377 F.3d 183, 189-90 (2d Cir. 2004)).  First, the ALJ must consider whether the child is engaged in work that constitutes "substantial gainful activity," which would automatically exclude her from benefits.  20 C.F.R. § 416.924(b).  Second, the ALJ must determine whether the child suffers from at least one "severe" medically determinable impairment that causes "more than minimal functional

limitations." Id. at § 416.924(c).  Third, if the ALJ finds a "severe" impairment, the next inquiry is whether it is the medical or functional equivalent of an impairment listed in 20 C.F.R. § 404, Appendix 1, Subpart P.  Id. at § 416.924(d).  Equivalence is demonstrated only if the child exhibits "extreme" limitation in one, or "marked" limitation in two, of the six domains established by the regulations.  Id. at § 416.926a(a).

    C.    ALJ's Duty to Fully Develop the Record

In deciding whether the ALJ's decision was based on substantial evidence, a reviewing court must determine whether the ALJ complied with his affirmative duty to develop fully the administrative record.  Rivera, 379 F. Supp. 2d at 604 (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)).  That duty applies "even when the claimant is represented by counsel" at the hearing.  Perez, 77 F.3d at 47.

Here, the ALJ failed to develop the administrative record properly.  As the Commissioner concedes, reports from two of Y.C.'s treating sources, Drs. Tapia and Pimentel, are absent from the record.  (Def.'s Mem. at 6-7).  Although Nunez testified that over the course of nearly eight months, Dr. Tapia ordered x-rays, prescribed physical therapy, and referred Y.C. to a neurologist, the record does not contain any of his treatment notes or reports.  (Id. at 7).  Similarly, although Dr. Pimentel explicitly noted that there was evidence that Y.C. had a learning disability in multiple subjects, (see R. 150), the ALJ did not develop this issue through testimony at the hearing or by seeking additional records.  (Def.'s Mem. at 7).

Additionally, Y.C.'s 2006-2007 school year report card, evidencing sixty-six absences and a summer school requirement, first became part of the record when it was submitted to the Appeals Council after the ALJ had issued his decision. As the Commissioner notes, Nunez's testimony that Y.C. missed school once or twice a week, every week, is consistent with that number of absences. (Id. at 7-8; R. 171, 189, 190). Although Nunez also testified that she thought her daughter's grades continued to be "normal," the Commissioner credibly asserts that the report card indicates a greater academic impact than Nunez understood or the record before the ALJ indicated. (Def.'s Mem. at 8; R. 191).

Since the ALJ did not fulfill his duty to develop the record fully, his decision was based on an incomplete record and therefore cannot be sustained.

D.  The Treating Physician Rule

The ALJ is also required to give "controlling weight to a treating physician's opinion on the nature and severity of a claimant's impairments when the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Colondres v. Barnhart, No. 04 Civ. 1841 (SAS), 2005 WL 106893, at *6 (S.D.N.Y. Jan. 18, 2005) (quoting 20 C.F.R. §§ 401.1527(d)(2), 416.927(d)(2)). The ALJ is further required to explain and provide "good reasons" for the failure to credit a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in

our notice of determination or decision for the weight we give your treating source's opinion."). The failure to do so is a ground for remand. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Colondres, 2005 WL 106893, at *6.

In that regard, the ALJ noted that Dr. Pimentel had indicated in his May 4, 2007, spinal disorder questionnaire that Y.C. had "degenerative disc disease and a herniated disc compromising the nerve root with sensory and reflex loss and positive straight leg raising tests." (R. 15). However, the ALJ did not indicate whether this evidence was consistent with or well-supported by other evidence in the record, nor did he provide reasons for rejecting it, as required by the regulations. Indeed, the ALJ failed to perform this required analysis with respect to any of the opinions of Y.C.'s doctors. Accordingly, his findings cannot be upheld because they are not supported by substantial evidence.

    E.    <u>Remand for Calculation of Benefits</u>

Nunez argues that the case should be remanded solely for the calculation of benefits. (Docket No. 13 at 14-15). A remand for such a calculation of benefits is an "extraordinary action and is proper only when further development of the record would serve no purpose." <u>Rivera</u>, 379 F. Supp. 2d at 604 (citing <u>Rosa</u>, 168 F.3d at 83).

Here, as the Commissioner correctly observes, there is considerable evidence in the record tending to support a finding of non-disability. Several doctors reported generally normal examination results with some mild abnormalities. For

instance, Dr. Shalhoub indicated that "[d]evelopment and activities have not been affected by the impairment of the neck pain and secondary headaches as well as low back pain." (R. 126). Dr. Schwab found that Y.C.'s pain was "intermittent and never disabling," that she had no neurologic neurovascular deficits, and that she demonstrated "excellent cervical and lumbar range of motion." (Id. 115-16). Dr. Pimentel reported that Y.C.'s neck flexor and prolonged walking caused her pain at times, but that the remaining results were normal. (Id. 162-63). In addition, although Y.C.'s grades slipped and she was required to attend summer school, there is no indication that she was held back. The Court therefore cannot say, as a matter of law, that Y.C. is entitled to benefits.

## IV. Conclusion

For all of the foregoing reasons, the Commissioner's motion to remand the case for further administrative proceedings is granted, and Nunez's cross-motion is denied.

SO ORDERED.

Dated: New York, New York
March 27, 2009

FRANK MAAS
United States Magistrate Judge

Copies to:

Michael D. Hampden, Esq.
Legal Services for Children, Inc.
271 Madison Avenue, 17th Floor
New York, New York 10016
[By First Class Mail]

Susan C. Branagan, Esq.
United States Attorney's Office
86 Chambers Street, 3rd Floor
New York, New York 10007
[By First Class Mail]